IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MARION J. ARNETT                                                                            PLAINTIFF

v.                                       No. 4:04CV00595 JLH

R.L. BROWNLEE,
ACTING SECRETARY,
DEPARTMENT OF THE ARMY                                                          DEFENDANT

**OPINION AND ORDER**

Plaintiff Marion J. Arnett, a former civilian employee of the United States Army, Little Rock District Corps of Engineers ("the Corps"), brought this employment discrimination action against the United States Army ("the Army"), claiming that he was refused a reasonable accommodation for his disability, retaliated against for engaging in protected activity, and terminated because of disability and age in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, Section 501 and 505 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, Title I and V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. The Army moves for summary judgment on the disability and age discrimination claims (Docket #15). The Court hereby GRANTS that motion in its entirety.[1]

**I. Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[1] Also pending are Arnett's motion for appointment of counsel (Docket # 27), the Army's motion for leave to file an answer out of time (Docket #33), and Arnett's motion to compel disclosure and extend discovery (Docket #35). In light of the Court's conclusions in this case, all three motions are denied as moot.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, the Court views the facts in the light most favorable to non-moving party and draws all inferences in his favor, keeping in mind that "summary judgment seldom should be granted in discrimination cases where inferences are often the basis of the claim." *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004) (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999)). *See also Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996).

## II. The Facts Viewed in the Light Most Favorable to Arnett

On June 21, 1999, the Corps hired Arnett, then aged 44, to work as a Realty Specialist, a GS-9 developmental position with a full performance level of GS-11.[2] Arnett was hired as a term employee, meaning that his first year of employment was a trial period during which the Corps could terminate him at any time as long as it abided by appropriate notification regulations. *See* 5 C.F.R. §§ 316.301 - 304. By regulation, the Corps was to utilize the trial period as fully as possible to determine the fitness of an employee; the Corps was also to terminate an employee during this period if he failed to demonstrate fully his qualifications for continued employment. 5 C.F.R. 315.803.[3]

---

[2] "Developmental position" means that Arnett worked under closer than normal supervision at the GS-9 level on assignments of progressive difficulty until full performance level was reached.

[3] If the Corps "decides to terminate an employee serving a . . . trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment," it was required to notify the employee in writing, providing him, at minimum, the reason why he was being separated, the Corps's conclusions as

As a Realty Specialist, Arnett negotiated real estate acquisitions for government projects and prepared associated documentation. In that function, Arnett was required to communicate or contribute to communication "by mail, by phone, and in person with landowners at all scales and levels of society (e.g., farmers, business executives, county and state officials, school board members, high ranking military officers, attorneys)," as well with legal representatives within the Corps, the Department of Justice, and the United States Attorney's Office. Internally, Arnett was also required to complete Negotiator's Reports, consisting of narrative summaries of his actions during the negotiation, resulting recommendations, and supporting mathematical entries and totals. Arnett's first level, or immediate, supervisor and performance rater was Anthony Ragar, the Assistant Chief of the Real Estate division. Arnett's second level supervisor and senior rater was Billy Cabe, the Chief of the Real Estate division. Arnett's team leader was Patricia Bennett, who assigned Arnett's daily work but was not considered a supervisor.

Arnett came to the Corps with no knowledge or belief that he suffered from dyslexia or other learning disability. Arnett knew that he had difficulty writing, often transposing letters and misspelling words, but, according to Arnett, the problem had never interfered with his ability to perform any job requiring him to do so. In past positions,[4] Arnett's supervisors evaluated his writing on content, not on spelling, punctuation, or grammar. Arnett testified that, approximately one month into his employment, Bennett told him that she thought he had dyslexia because it reflected itself in his writing. Bennett told Arnett what she knew about dyslexia and later gave him

---

to the inadequacies of his performance or conduct, and the effective date of his separation. *See* 5 CFR § 315.804(a).

[4] Prior to joining the Corps as a Realty Specialist, Arnett worked as a construction representative for a private architectural and engineering firm and for the Air Force, managing construction projects.

literature to read on the subject. Arnett apparently adopted Bennett's belief that he had dyslexia. Despite Bennett's suggestion to do so, however, Arnett did not seek medical diagnosis of the problem at his own expense or the Corps's. Instead, he asked Bennett if she would identify mistakes on his paperwork and return it to him for corrections so that he could learn from his mistakes.[5] The mistakes Bennett identified in his writing varied from transposed letters, punctuation errors, grammatical mistakes, and missed spacing, to content-related mistakes involving unique Corps terminology with which Arnett was not familiar. According to Arnett, Bennett never told him that he was performing poorly. When asked whether he needed to perform better, Bennett dismissed the notion, telling Arnett, "you just transpose a few letters, there's nothing bad about that, happens all the time." Ragar, too, told Arnett that he was doing a good job up until April.

In January 2000, Arnett turned in a Negotiator's Report to Ragar that Bennett had not corrected. Upon reviewing it, Ragar was "amazed at how poor the writing was." Thinking that Arnett had rushed in preparing the report, he consulted with Bennett, only to find out that the report was typical of the quality she received from Arnett. Ragar asked Bennett to keep copies of Arnett's draft reports in the future. Ragar testified that review of these subsequent reports caused him deep concern. Overlooking stylistic errors, including Arnett's non-usage or misusage of Corps terminology, Ragar believed that the content could have been clearer, the spelling was somewhat lacking, the grammar was seriously lacking, and the overall quality fell below Corps standards. Ragar was most concerned with the grammar-related problems reflected in both Arnett's oral and written communication. According to Ragar, no similarly situated employee exhibited such problems. Ragar testified that Arnett would "never be the professional person we needed to go out

---

[5] There is evidence that Bennett corrected other Realty Specialists' drafts, so Arnett was not unique in that regard.

and talk to landowners . . . . He was not functioning even at the nine level, much less [at] . . . a higher level." Ragar informed Cabe of the problems and recommended that Cabe terminate Arnett before the end of his probationary term.

On April 18, Ragar informed Arnett that management intended to terminate him before the end of his probationary term. Arnett told Ragar that Bennett said that he had dyslexia and asked him if the Corps could provide him training in areas they felt he was deficient. Ragar responded that Arnett's writing was probably on a fifth or sixth grade level and that it was going to take real remediation to bring it up to par, the kind of long-term remedial training that the Corps did not have the luxury of offering to a probationary employee. Probationary employees, said Ragar, were required to show competent performance within one year. Arnett's year was up at the end of June. Arnett testified that Ragar told him that his poor grammar skills were probably the result of bad habits picked up at an early age or in the military.

Some time after this, Cabe, Ragar, and Arnett met and Cabe told Arnett that he was terminating him, with formal notice to follow. Arnett testified that Cabe told him that he was being terminated because of his poor communication skills and because he had applied for a GS-11 appraiser position in early April. Cabe asserts that he terminated Arnett solely because of his lack of communication skills, which he had personally observed and received complaints of from Ragar and Bennett. After receiving this information, Arnett contacted Corps's Equal Employment Opportunity personnel and began discussing related matters with them. Some time after, Arnett received a performance appraisal indicating an overall performance rating of "unsuccessful," the lowest of five possible rating levels, based on Arnett's failure to meet the standard in "communication."

On May 3, 2000, Cabe sent Arnett a letter formalizing the separation and announcing the effective date of June 2, 2000. The letter stated that Arnett was being terminated based on his "poor communication skills, both oral and written." The letter went on to explain that the purpose of the one-year trial period under 5 C.F.R. § 316.304 was to determine whether an employee possessed the skills, conduct, performance, and character traits necessary for continued employment and that Arnett had not displayed these characteristics.

After notice of termination, Arnett saw Dr. Glen H. Lowitz, a clinical psychologist, to determine whether he had dyslexia. Dr. Lowitz prepared a psychological evaluation report on May 18, 2000, summarizing Arnett's test results in the Weschler Adult Intelligence Scale - III and the Weschler Individual Achievement Test and concluding that Arnett "manifests an atypical developmental learning disorder (learning disability) . . . with impact upon reading and spelling." Dr. Lowitz recommended that Arnett enroll in adult reading and spelling classes, practice reading aloud to family members, and use reading and spelling aids to combine auditory, visual, and tactile input. Arnett presented Dr. Lowitz's report to Corps officials some time prior to his effective termination date.

Arnett was effectively terminated on June 2, 2000, after which he filed timely claims of retaliation and disability and age discrimination.

**III. Application of the Law to the Facts Viewed in the Light Most Favorable to Arnett**

    **A.    Disability Discrimination**

Arnett alleges in his complaint that "[t]he defendant['s] stereotypic assumptions that the plaintiff lacked the ability to perform his job as a result of his mental impairment . . . [led] the defendant to terminate the plaintiff's employment on the pretext that the plaintiff could not communicate written or orally." Arnett also alleges that the Corps denied him reasonable

6

accommodation for his disability when it refused to offer him training as requested on April 18, 2000. The two claims are distinct but are both assessed under the Rehabilitation Act.[6] The Rehabilitation Act provides, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

## I. Disparate Treatment

Arnett's first claim is a claim of disparate treatment. Absent direct evidence of discrimination, a disparate treatment claim is assessed under the traditional burden-shifting framework set forth by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). *See also Norcross v. Sneed*, 755 F.2d 113, 116-17 (8th Cir. 1985) (noting, however, that a Rehabilitation Act claimant must show that his disability was the *sole* reason for the decision.) The plaintiff must first make out a *prima facie* case of disability discrimination, showing (1) that he is "disabled" under the Act; (2) that he is qualified to perform the essential functions of his job, with or without accommodation; and (3) that he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021-22 (8th Cir. 1998) (*en banc*); *Norcross*, 755 F.2d at 116 n.3 (citation omitted). If the plaintiff establishes a *prima facie* case, then the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Norcross*, 755 F.2d at 116 n.3 (citation omitted). Having done so, the burden then shifts back to the plaintiff to show that the employer's proferred reason is pretextual and that the plaintiff suffered the adverse employment action *solely* because of his disability. *Id*.

---

[6] The Americans with Disabilities Act does not cover federal government employers. *See* 42 U.S.C. § 12111(5)(B).

The Army argues that Arnett cannot show that he is "disabled" and that he also fails to demonstrate that the Corps's legitimate, non-discriminatory reason for terminating Arnett's employment is pretextual. Assuming that Arnett was disabled and thus protected by the Act, the evidence is insufficient to support a reasonable inference that Arnett was terminated because of any actual or perceived learning disability.

The Corps explains that Cabe terminated Arnett because of poor written and oral communication skills and not because of his learning disability. Considerable evidence supports this explanation: Cabe's testimony that he received complaints about Arnett's communication skills from Ragar and Bennett; Cabe's testimony that he was unimpressed with work he received from Arnett; Ragar's testimony that Arnett's draft products were below standard and that he lacked the professionalism required by the position; Arnett's testimony that he received a failed rating in the area of communication; and, most importantly, the complete lack of evidence that Cabe or Ragar was aware of Arnett's learning disability or perceived him to have any disability prior to the decision. Arnett attempts to refute this evidence by contending that he displayed adequate communication skills,[7] that he was treated differently than other term employees,[8] and that Cabe terminated him because he wanted to hire and promote non-disabled employees into vacant positions Arnett would

---

[7] Arnett submits Army Regulation 25-50 which states that "[e]xcessive revisions to create a 'perfect' product are a waste of time." He also submits the investigatory report conclusions of EEO officer, Mary E. Clarke, which state that a review of submitted work products gave credence to Arnett's assertion that the majority of his errors consisted of format or preferred phraseology, not content.

[8] Arnett alleges that he was evaluated by different standards than his co-workers, limited in his assignments, given less leverage to negotiate his assignments, and given less desirable job tasks than his co-workers.

8

be applying for.[9] Arnett's third contention is completely unsupported by the record. No evidence has been presented that supports a conclusion that Cabe or even Ragar knew at the time of the decision that Arnett suffered from a learning disability, nor that either person perceived Arnett to have dyslexia or another disabling condition. As for the first two contentions, even a fact issue on these questions would not defeat summary judgment. *See Wilking v. County of Ramsey*, 153 F.3d 869, 873-74 (8th Cir. 1998).

The Eighth Circuit states that when reviewing an employer's proffered reason for discharge and a plaintiff's rebuttal of that reason, a court should remember that "courts do not sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir.1994) (quotations omitted). "Accordingly, 'when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether that reason was wise, fair, or *even correct*, ultimately, so long as it truly was the reason for the plaintiff's termination.'" *Wilking*, 153 F.3d at 873 (quotation omitted) (emphasis added).

In *Wilking*, a case analogous to this case, the Eighth Circuit stated,

> To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both "that the employer's articulated reason for the adverse employment action was false *and* that discrimination was the real reason." "This burden will not be met by simply showing that the reason advanced by the employer was false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations." Specifically, the plaintiff "must do more than simply create

---

[9] Arnett states in his response brief that when he applied for an appraiser job, Cabe was the selecting official, and, as such, became aware that Arnett would be eligible for six positions in the department. Arnett contends that Cabe, knowing that the Rehabilitation Act mandated affirmative action, Cabe terminated Arnett to achieve his goal of hiring non-disabled employees.

> a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination."

*Id.* at 874 (citations omitted).

In *Wilking*, the plaintiff, a clinical nurse specialist who suffered from chronic depression, was discharged by the defendant during her probationary period because of alleged productivity problems and seeming disinterest in her job. The defendant had no knowledge of the depression when it made the decision to discharge the plaintiff but did not set the effective date of discharge until after it became aware of the depression when the plaintiff was hospitalized for the condition. In the plaintiff's effort to prove pretext, she argued that the defendant was aware of her depression at the time of the actual discharge and that her work performance was not sufficiently poor to warrant her discharge. The Eighth Circuit held that neither argument could preclude the grant of summary judgment in the defendant's favor. *Id.*

So it is the case here. Viewing the evidence in the light most favorable to Arnett, Ragar recommended discharge to Cabe some time after January. Cabe adopted Ragar's recommendation based on his own observations and complaints from others and decided to terminated Arnett. On April 18, Ragar informed Arnett that Cabe intended to discharge him before his probationary period was up. After that announcement, Arnett told Ragar for the first time that he thought he had dyslexia. Arnett had never disclosed his belief to Ragar or Cabe prior to this date. No evidence shows that Ragar or Cabe knew, suspected, or heard rumors about the possibility of dyslexia prior to this date. Nor can the Court reasonably infer knowledge on the part of Ragar or Cabe when evidence of such does not exist. *Cf. Miller Nat'l Casualty Co.*, 61 F.3d 627, 630 (8th Cir. 1995) (stating that symptoms of plaintiff's mental impairment in that case were not "so obviously manifestations of an underlying disability that it would be reasonable to infer that her employer

10

actually knew of the disability.") The only evidence that anyone, beside Arnett, believed that Arnett had dyslexia prior to April 18 related to Bennett and, possibly, to Realty Specialists whom she told. Bennett and the other Realty Specialists, though, did not participate in the decision to terminate Arnett. The undisputed evidence shows that Cabe made the decision to terminate.

As in *Wilking*, although Arnett was not actually terminated until after the Corps became aware that (1) Arnett thought he had dyslexia and (2) that he was diagnosed with a learning disability by Dr. Lowitz, the evidence clearly shows that the decision had been reached solely because the Corps believed Arnett lacked necessary communication skills, not because he was disabled. *Cf. id.*[10] Accordingly, the Army is entitled to summary judgment in its favor on this claim.

### ii. Reasonable Accommodation

As noted, Arnett also claims that he was denied reasonable accommodation for his disability in violation of the Rehabilitation Act when, on April 18, he requested training to improve his communication skills and Ragar denied that request. An employer unlawfully discriminates in violation of the Rehabilitation Act "if the employer does not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Ballard v. Rubin*, 284

---

[10] In *Wilking*, the plaintiff admitted that her poor performance was not a result of her depression. Even if Arnett argued that any inability to communicate *was* the result of his learning disability, the Court's conclusion would be the same. "Dismissing an employee because of the job performance consequences of a disability, rather than the disability itself, is not actionable under [federal disability laws]." *McConnell v. Pioneer Hi-Bred Intern., Inc.*, (D.S.D. 2000) (citing *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219, n.3 (8th Cir. 1999)); *See also Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997) ("The employer who fires a worker because the worker is a diabetic violates the Act; but if he fires him because he is unable to do his job, there is no violation, even though the diabetes is the cause of the worker's inability to do his job.")

F.3d 957, 960 (8th Cir. 2002) (internal quotation marks and citation omitted). The Army argues that Arnett failed to timely request accommodation and that the requested accommodation was unreasonable.

Even without assessing whether such a request would be reasonable under other circumstances, Arnett's request for training in this case was untimely. *See Mole*, 165 F.3d at 1218. In *Mole*, the plaintiff after receiving notice of termination, requested specific accommodations from the employer. The Eighth Circuit held that, given the timing of the requests, the employer did not violate any duty to reasonably accommodate. *Id.* As in that case, Arnett did not request any accommodation, training or otherwise, from Ragar or Cabe upon first believing he had dyslexia. According to Arnett, he "didn't think it was necessary." Arnett first requested training on April 18. As noted, Cabe had made known his intention to discharge Arnett by this date. Indeed, the request for training came only after Ragar informed Arnett of Cabe's decision. Even if Arnett believed up until this time that his supervisors were pleased with his performance and that his communication skills were up to standard, the Corps had no obligation to notify Arnett of perceived deficiencies. By regulation, the Corps could discharge Arnett based on his performance at any time within the probationary term as long as it gave him proper notice. *See* 5 C.F.R. §§ 316.304; 315.804(a). Under these circumstances, the Army need not have entertained the request. *Mole*, 165 F.3d at 1218; *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (holding that a request for accommodation was untimely when the plaintiff requested accommodation only *after* she twice committed a work-related offense).

Moreover, even if the request had been timely, Arnett has made no assurances that the requested training would remedy his job performance. *See Mole*, 165 F.3d at 1218; *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). As stated, Arnett was serving under a

12

probationary term and could be terminated at any time within his first year. The Corps interprets its regulatory authority to *require* termination within that year if performance was not up to standard. By his own evidence, Arnett's test scores in the Wechsler Individual Achievement Test showed significant discrepancies between his measured ability level and his achievement in the basic academic areas. According to Dr. Lowitz's report, Arnett tested at the sixth grade level in the area of spelling (scoring in the seventh percentile for his age and measured ability level); in reading recognition, at the seventh grade level; in reading comprehension, at the sixth; and in numerical operations, at the eighth. Even without assuming that the remediation required to bring Arnett's communication skills up to the Corps's standards would be extensive, Arnett has provided the Court no proof that training of the kind requested would resolve his communication problems. Accordingly, the Corps is entitled to summary judgment on this claim. *See Mole*, 165 F.3d at 1218; *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999).

### B. Age Discrimination

Arnett brings a claim of age discrimination under the ADEA. Under the ADEA, it is unlawful for an employer to discriminate against an employee because of the employee's age if the employee is more than 40 years old. 29 U.S.C. §§ 623(a)(1), 631(a).

The only allegations implicating age in Arnett's complaint are that "[t]he defendant regarded the plaintiff . . . as being too old to learn" and that "when the plaintiff asked for training he was refused by the defendant and told that because of his age he could not learn." In his deposition, Arnett discussed his age discrimination claim as follows. First, he asserted that "[Ragar] stated that bad habits were – probably the reason for my poor grammar was due to bad habits of my early age." Then he asserted:

> [M]y whole disability is based on age. If I was a young person in the fifth grade or – if I was a young person and the disability is based upon me not being able to function or not being able to learn, and it's – it's a well known fact that a lot of people believe that children back in my era were lazy and did not want to learn. They had other things to do, but reality is now we found out that there's other reasons why these children have problems learning. They did not understand phonetics, they do not – you know, some are dyslexic. In my case, I had atypical learning disability. But back when I was going to school, I didn't know that.
>
> So when Mr. Ragar address that from "poor habits in your early age," well, that's the old typical thought that people has been thinking all along. So you tend to get stereotyped. You didn't do good when you was young, so what makes you thing you're going to good when you're older.

Again in his brief opposing summary judgment, Arnett asserts that he "alleges age discrimination because Mr. Ragar stated, if [he has] not learned at his age he would never learn and he did not know how the plaintiff was able to make it through college." Arnett goes on to contend that "[t]he statement is typical of a person who believes older people can't learn or progress to higher skills."

The Court agrees with the Army that the only age-based claim Arnett appears to make relates to his request for accommodation and its refusal by Ragar. As stated above, the Corps is entitled to summary judgment on that claim. Even if age had something to do with the Corps's refusal of the request, the request would still be untimely and unreasonable for the reasons given above. For this reason, the Army is entitled to summary judgment on the age discrimination claim.[11]

### C. Retaliation Claim

In his complaint, Arnett claims that the Corps retaliated against him for requesting assistance from the agency's Equal Employment Opportunity manager on April 19 and 27, 2000, by failing him on a job performance evaluation on April 28, 2000. The Army does not address this

---

[11] This conclusion is not changed by the references to allegedly similarly situated younger employees or the unsupported allegation that, at the time when Ragar made the incriminating comment, the Corps had been made subject of a complaint of age discrimination.

claim in its motion for summary judgment. Even so, the Court is obligated to raise the issue of subject-matter jurisdiction if lacking. *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 n.2 (8th Cir. 2001) (citation omitted).

"It is well settled that administrative remedies must be fully exhausted before jurisdiction vests in the federal courts." *Edwards v. Dep't of the Army*, 708 F.2d 1344, 1346 (8th Cir. 1983). Whether the retaliation claim is brought under Title VII or the ADEA, federal court jurisdiction over the claim is only proper if Arnett first exhausted his administrative remedies. *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) ("Exhaustion of administrative remedies is a condition precedent to the filing of an action under the ADEA in federal court."); *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996) (same for Title VII). "Exhaustion of administrative remedies is central . . . because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994).

It is undisputed that Arnett timely filed an administrative claim with the Army alleging that he was terminated in violation of the Rehabilitation Act and the ADEA. Arnett indicated in his formal claim that he believed that he was discriminated against on the basis of his mental handicap and age. It is also undisputed that on October 23, 2000, Tyrone Hammond, the EEO manager of the Corps's Little Rock District, identified Arnett's claims as based upon an alleged mental handicap and age discrimination. Arnett was given five days to contest this finding but did not do so. Upon notice that the Army found no merit in those claims, Arnett filed a timely appeal to the Equal Employment Opportunity Commission ("EEOC"). The EEOC likewise dismissed his claims of disability and age discrimination.

Although courts will liberally construe an administrative charge for exhaustion of remedies purposes, the Eighth Circuit cautions that "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made." *Shannon*, 72 F.3d at 685 (internal quotation marks and citation omitted). The claims of discrimination stated in the complaint may only be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge. *Parisi*, 400 F.3d at 585.

Arnett has not exhausted his claim of retaliation. Nothing on Arnett's formal complaint filed with the Corps indicated that he alleged retaliation. Indeed, he left unmarked the space indicating that a complainant alleges "Reprisal." Likewise, Arnett did not contest the finding of Hammond or the EEOC that he brought claims of disability and age discrimination only. It is well-settled that "retaliation claims are not reasonably related to underlying discrimination claims." *Wallin v. Minn. Dep't of Corrs.*, 153 F.3d 681, 688 (8th Cir. 1998). It is also clear from the record that Arnett's specific retaliation claim did not grow out of the discrimination charge he filed with the EEOC. *Cf. id.* at 688-89. Accordingly, the Court lacks jurisdiction over this claim.

## CONCLUSION

For the reasons contained herein, the Court GRANTS summary judgment as to all claims in the complaint.

IT IS SO ORDERED this ___26th___ day of July, 2005.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE